Filed 6/23/25  In re Ezekiel R. CA2/3

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| In re Ezekiel R., a Person Coming Under the Juvenile Court Law. | B340290<br><br>(Los Angeles County Super. Ct. No. 23CCJP03155A) |
| LOS ANGELES COUNTY DEPARTMENT OF CHILDREN AND FAMILY SERVICES,<br><br>      Plaintiff and Respondent,<br><br>      v.<br><br>A.C.,<br><br>      Defendant and Appellant. | |

APPEAL from an order of the Superior Court of Los Angeles County, Cathy Ostiller, Judge.  Affirmed.

Jill Smith, under appointment by the Court of Appeal, for Defendant and Appellant.

Dawyn R. Harrison, County Counsel, Kim Nemoy, Assistant County Counsel, and Brian Mahler, Deputy County Counsel, for Plaintiff and Respondent.

———————————————

A.C. (mother) appeals from a juvenile court order terminating her parental rights. Her son, Ezekiel R., became a dependent of the juvenile court due to mother's untreated mental illnesses and domestic violence with her partner. Mother was bypassed for family reunification services. At the hearing to select a permanent plan, mother argued that the parental benefit exception to adoption applied. The juvenile court found mother had not maintained regular visitation and contact with Ezekiel, she did not establish a sufficient benefit from continuing the relationship, and she failed to establish that the termination of parental rights would be detrimental to Ezekiel. We affirm the juvenile court order.[1]

## FACTUAL AND PROCEDURAL BACKGROUND

In 2021, a juvenile court terminated mother's parental rights to Ezekiel's older half sibling. The half sibling had become a dependent of the juvenile court due to mother's mental health and anger issues, incarceration, and inability to care for the child.

---

[1] Mother's opening brief and notice of appeal state that she is also appealing from an order denying her Welfare and Institutions Code section 388 petition. However, her opening brief raises no related argument of error and, in her reply brief, she clarifies that she is only challenging the termination of her parental rights.

In August 2023, the Los Angeles County Department of Children and Family Services (DCFS) received a general neglect referral regarding then two-year-old Ezekiel (born September 2020). The caller reported that Ezekiel lacked sufficient food, had marks on his body (which mother later stated were due to mosquito bites), and smelled like urine and feces. The reporter also indicated that mother and her boyfriend, R.R., engaged in domestic violence in Ezekiel's presence. R.R. had recently been arrested after assaulting mother.[2]

On September 7, 2023, the juvenile court detained Ezekiel from mother and placed him in the home of maternal grandmother.[3] The September 2023 detention report stated that, according to maternal grandmother, mother had various mental health diagnoses. Mother was resistant to treatment and had been placed on psychiatric holds. She had been diagnosed with Schizoaffective Disorder Depressive Type and Bipolar Disorder, and had been hospitalized twice. However, when a social worker interviewed mother, she denied any mental health issues or need for related services.

Mother admitted to domestic violence between her and R.R., as did R.R. According to R.R., some of their fights were in

---

[2]    DCFS later obtained a police report regarding a June 2023 violent incident between mother and R.R. Police observed swelling on mother's eye and redness on her neck. R.R. was arrested. According to a DCFS report, R.R. accused mother of punching him in the face 15 times during the incident. Ezekiel was present. R.R.'s seven-year-old brother also said that mother pushed him, causing him to fall to the floor.

[3]    DCFS completed a due diligence search for Ezekiel's alleged father. His whereabouts are unknown.

Ezekiel's presence. Mother claimed she and R.R. had ended their relationship. Mother was convicted of domestic battery in 2022 and 2023. Her failure to comply with mental health services led to the termination of her parental rights over her older child. Maternal grandmother expressed concern about mother's ability to care for Ezekiel given her unresolved mental health and domestic violence issues.

At a September 18 detention hearing, the court granted mother monitored visitation, three times weekly for three hours per visit. Ezekiel remained in maternal grandmother's home.

In October 2023, DCFS filed an amended petition. The petition alleged Ezekiel was a person described by Welfare and Institutions Code section 300 due to mother's untreated mental health and emotional issues, which had led to Ezekiel's half sibling receiving permanent placement services.[4] The petition further alleged dependency jurisdiction was warranted based on mother's history and pattern of domestic violence with her male companions, including Ezekiel's alleged father and R.R.

In November 2023, the juvenile court sustained both counts of the petition. At a February 2024 disposition hearing, the court removed Ezekiel from mother and denied her family reunification services pursuant to section 361.5, subdivisions (b)(10) and (11). The court granted mother monitored visitation, three times a week for three hours a visit. The placement with maternal grandmother had previously been terminated after DCFS learned that maternal grandmother allowed mother an unmonitored visit, and that mother and maternal grandmother had a violent

---

[4] All further statutory references are to the Welfare and Institutions Code.

4

physical altercation in Ezekiel's presence. The juvenile court set a hearing pursuant to section 366.26.

***Permanency Planning Period***

In May 2024, DCFS submitted a section 366.26 report recommending adoption with the current foster parents as the permanent plan. Ezekiel had lived with the foster parents since February and had developed a secure bond with them. The foster parents were the adoptive parents of Ezekiel's older half sibling.

While Ezekiel was too young to make a meaningful statement about adoption, the DCFS social worker found he "appears to be bonded to the caregivers. Ezekiel seems to be happy and thriving in the home. The caregivers are attentive and loving towards Ezekiel." Ezekiel called the foster mother "mama" and her first name, or just her first name. He called the foster father "dad" or by his first name. He gave them hugs and sought them out in the mornings to snuggle. He had developed a secure and stable relationship with the foster parents.

DCFS reported that while Ezekiel was in maternal grandmother's care, mother visited three to four times a week. However, between January 19 and mid-May 2024, mother had 7 visits with Ezekiel and canceled 19 visits. Other visits were canceled because the monitor was unavailable, the caregivers were out of town, and due to a holiday office closure.

Ezekiel told a social worker that he liked seeing mother. He had asked a social worker to take him to see mother, although it is not clear if this occurred more than once or when it occurred. He hugged and kissed mother during visits, and they played with age-appropriate toys. Mother was affectionate and attentive. She changed Ezekiel's diapers as needed and engaged him in activities. Ezekiel referred to mother as his mom.

The foster mother reported that Ezekiel was excited and happy to see mother and did not express anything negative about her. Yet, the foster mother also reported that Ezekiel appeared emotionally drained and tired after visits and more " 'clingy.' " He had expressed worry about mother and mentioned that her foot hurt. The foster mother observed that when Ezekiel was aware of a missed visit, he became frustrated more easily, said "no" more often, and was sad. However, after a recent missed visit, Ezekiel did not "appear to be negatively impacted . . . as there was no change in behavior." When Ezekiel returned from visits with mother, he would immediately run to play with his toys, bike, and trampoline. He did not display any negative behaviors at the end of his visits with mother.

The report concluded that Ezekiel had a positive emotional attachment with mother. He recognized mother as his mother. There would be some negative impact on him if he did not have visits with her. However, DCFS also opined that Ezekiel was of such a young age that it did not appear that severing the relationship with mother would cause emotional instability, behavioral issues, or distress. He was receiving therapy in his current placement that he had not received before, and had enrolled in preschool. DCFS recommended a permanent plan of adoption.

On June 5, mother filed a section 388 petition requesting family reunification services. The petition indicated mother was attending a parenting program, an anger management program, and weekly therapy. The juvenile court set a hearing and ordered DCFS to prepare a report.

In its June 26 report, DCFS reported that mother said she was attending parenting and anger management classes and

therapy. Mother reported good mental health and said she did not have any current mental health diagnoses. However, mother's participation in services was inconsistent, as she had canceled or failed to attend multiple therapy sessions. DCFS also learned of an April 2024 altercation between mother and R.R. in the DCFS office parking lot, which was documented in a police report. A witness saw R.R. grab mother by the neck for about 7 to 10 seconds and shove her against a car. Although mother initially reported that R.R. punched her, she later recanted and said that she tripped and R.R. grabbed her by her sweatshirt. DCFS reported mother had lied about still being involved with R.R. and was minimizing and denying the domestic violence in their relationship. She had untreated mental health issues and was resistant to treatment.

On July 18, DCFS also reported on mother's visitation in May and early June. Mother canceled two visits in mid-May. She missed an early June visit because of a court appearance. Mother canceled another visit in early June because she was pregnant and gave birth to her baby. The report described four in-person visits, three in May and one in early June. During these visits, mother played with Ezekiel; Ezekiel watched shows on mother's phone; mother hugged and consoled Ezekiel when he got upset; mother changed his diaper; Ezekiel brought mother flowers and hugged her; mother brought Ezekiel new clothes, shoes, and toys; and mother showed Ezekiel how to tie his shoes.

On July 18, DCFS filed a request for an order restricting mother's visits to the DCFS office or the foster family agency. In late May, DCFS had received a video from an anonymous source showing a lap with a gun on it. In the video's audio, mother could be heard saying: " 'Come get it back on blood bitch, come get it

7

bitch.' " The gun was on a red rag, indicating gang affiliation. In early July, DCFS was sent: (1) a text message in which mother threatened harm to her friend, the friend's mother, and the friend's children; (2) a photo of a gas tank that belonged to a family friend that mother had allegedly filled with a corrosive substance; (3) an audio recording of mother and her boyfriend, R.R., fabricating a story to tell DCFS about the April 2024 incident during which R.R. was observed grabbing mother's neck; and (4) audio of a conversation between R.R. and a friend in which he admitted hitting Ezekiel and recommended that his friend hit Ezekiel too. Thus, DCFS requested that all future visits occur in a secure setting with security guards.

The July 18 request also stated that since January 19, 2024, mother had visited Ezekiel 10 times and canceled 19 times. Mother gave birth to a child on June 7, so visits were paused. Mother had a FaceTime visit with Ezekiel while she was in the hospital.

On July 18, DCFS also received a call from the director of mother's anger management program. According to the director, when Mother had returned to the program for the first time after giving birth, she was wearing sunglasses and a hairnet. Mother said that her boyfriend had given her a black eye and pulled out some of her hair. The director observed what appeared to be a "fresh black eye."

On August 2, DCFS submitted a status review report. Ezekiel continued to live with the foster parents and shared a bedroom with his half sibling. He appeared well cared for and very attached to his caregivers. He was healthy and developmentally on target. He was still in preschool and attending therapy. Ezekiel maintained a strong bond with his

prospective adoptive parents, where he was safe, and his needs were met. On August 6, mother filed a motion requesting that Ezekiel testify at the section 366.26 hearing about his bond with mother. Ezekiel's counsel opposed the motion. Attached to the opposition was a declaration from the foster father indicating Ezekiel had been violent in visits lately, both with mother and the monitors. The declaration, dated August 13, also stated mother had canceled 22 out of 49 "offered" visits and ended 5 visits early. The court denied the motion. The court also denied mother's request for a bonding study. The court reasoned it was late in proceedings and ordering a bonding study would delay permanency. The court noted it already had a significant amount of evidence about the quality and quantity of the visits.

On August 19 and 21, 2024, the juvenile court held an evidentiary hearing on mother's section 388 petition. On the subject of visitation, mother testified she had canceled 15 out of 49 scheduled visits with Ezekiel due to her own doctor's and probation appointments. Mother denied ongoing domestic violence with R.R. On cross-examination, she admitted she had failed to take medication for her diagnosed mental illnesses and that she was not currently taking medication.

The juvenile court denied mother's section 388 petition, explaining that although mother was making efforts, she had not established sufficiently changed circumstances and had still recently been involved in domestic violence.

### Section 366.26 Hearing

On August 21, 22, and 23, 2024, the juvenile court held the section 366.26 hearing. It admitted the evidence from the section 388 hearing. It also admitted the section 366.26 report and a video recording of a visit, with an accompanying transcript.

9

M.B., R.R.'s mother, testified. Mother and Ezekiel lived with her for around one year when Ezekiel was two years old. Mother fed Ezekiel, played with him, and bathed him "pretty much daily." He was very "clingy" with mother and cried when she left. When mother returned, Ezekiel would jump into her arms and smile, and he also would tell mother he loved her. Between September and December 2023, after Ezekiel moved in with maternal grandmother, M.B. drove mother to visits. Ezekiel would run to greet mother, told her he loved her, and appeared happy to see her.

A DCFS social worker also testified. In June 2024, she had informed mother that she no longer qualified for a visitation monitor because of a new policy assigning monitors to families receiving reunification services. The social worker also testified that mother missed a month of visits around June and July because of her new baby. According to the social worker, mother gave birth, then DCFS "didn't hear from her. So I can't tell you what portion of [the time period that mother missed visits] specifically was due to her having a baby."

Mother also testified. Before Ezekiel was detained in August 2023, mother had been his primary caregiver. According to mother, when Ezekiel lived with maternal grandmother, mother did not miss any visits. During visits, mother cooked for Ezekiel, bathed him, taught him to brush his teeth, put him down for naps, prepared his meals, bought him shoes and clothes, and went to doctor's appointments with him, including when scheduled outside of visit times. Ezekiel was excited to see her and did not want her to leave.

After Ezekiel was removed from his maternal grandmother's home, he was "extremely clingy" and happy with

mother during visits.  Mother would bring him books, clothes, and snacks; help him learn new things; and they would watch movies.  Mother canceled 18 visits because of her high-risk pregnancy, doctor's appointments, check-ins with probation, and "being ordered to stay away from people for five days."  She tried to make up the visits in person, but DCFS did not allow it.  She made up three visits on FaceTime.

The juvenile court found that mother had not met her burden of establishing the parental benefit exception applied.  The court stated mother had canceled 22 out of 49 visits.  Recently, mother was inconsistent, missed visits, and ended visits early.  The court recognized that mother canceled some visits because she gave birth and DCFS was no longer able to provide her with a monitor.  The court continued, "I have no doubt that mother loves her child, and I think the child probably has positive feelings for mother.  But I also feel that the child is very bonded to the caregivers and not as much to mother in this situation."  The record did "not suggest to the court that there is a strong enough bond with mother that outweighs the stability that the child would have in the current placement with the caregivers."  The juvenile court concluded mother had not established the parental benefit exception.

After a short break, the court also remarked: "I also wanted to note for the record, part of the court's consideration today, too, is the lack of stability with mother.  The recent incidents with [R.R.] and mother's lack of credibility about what was going on with [R.R.] . . . also weigh in favor of proceeding today because I don't believe that she can offer the kind of stability that this child needs.  And I think the child is in a much better situation in the current placement."

11

The court went on to explicitly state that mother had not met her burden as to any of the three requirements to establish the parental benefit exception to adoption. It concluded no exception to adoption applied and terminated parental rights.

Mother timely appealed.

## DISCUSSION

### I. The Parental Benefit Exception to Adoption

At the section 366.26 hearing, the juvenile court must select a permanent plan for a dependent child to provide the child a "stable, permanent" home. (§ 366.26, subd. (b); *In re S.G.* (2024) 100 Cal.App.5th 1298, 1313.) If the court finds by clear and convincing evidence that the child is likely to be adopted, the court must terminate parental rights, unless the parent establishes that termination would be detrimental to the child for one of the reasons outlined in section 366.26, subdivision (c). (*In re Caden C.* (2021) 11 Cal.5th 614, 630 (*Caden C.*).) The " 'statutory exceptions merely permit the court, in exceptional circumstances [citation], to choose an option other than the norm, which remains adoption.' [Citation.]" (*Id.* at p. 631.)

Here, mother contends the juvenile court erred by declining to apply the parental benefit exception to adoption. Under section 366.26, subdivision (c)(1)(B)(i), the juvenile court may choose a permanent plan other than adoption when it finds termination of parental rights would be detrimental to the child because the parents have maintained regular visitation and contact with the child and the child would benefit from continuing the relationship.

The California Supreme Court has explained that a "parent asserting the parental benefit exception must show, by a preponderance of the evidence, three things. The parent must

12

show regular visitation and contact with the child, taking into account the extent of visitation permitted.  Moreover, the parent must show that the child has a substantial, positive, emotional attachment to the parent—the kind of attachment implying that the child would benefit from continuing the relationship.  And the parent must show that terminating that attachment would be detrimental to the child even when balanced against the countervailing benefit of a new, adoptive home." (*Caden C., supra*, 11 Cal.5th at p. 636.)

On appeal, we review the first two requirements for substantial evidence.  (*Caden C., supra*, 11 Cal.5th at pp. 639–640.)  We do " 'not reweigh the evidence, evaluate the credibility of witnesses, or resolve evidentiary conflicts.' [Citation.]  The [juvenile court's factual] determinations should 'be upheld if . . . supported by substantial evidence, even though substantial evidence to the contrary also exists and the . . . court might have reached a different result had it believed other evidence.' [Citations.]" (*Id.* at p. 640.)  We review the third requirement for an abuse of discretion.  We will find an abuse of discretion "only when ' " 'the . . . court has exceeded the limits of legal discretion by making an arbitrary, capricious, or patently absurd determination.' " ' [Citation.]" (*Id.* at p. 641.)

## II.    The Juvenile Court Did Not Err in Concluding the Parental Benefit Exception Did Not Apply

### A.    Regular visitation and contact

Mother contends the evidence was insufficient to support the juvenile court's finding that she did not establish regular visitation and contact with Ezekiel.  She argues that by relying on evidence that she had missed 22 out of 49 visits, as reported by the foster father, the court only considered the time between

13

February and the August section 366.26 hearing.  She asserts she visited regularly when Ezekiel lived with maternal grandmother, and later missed visits due to her pregnancy, probation appointments, and the foster parents or DCFS canceling.  We conclude that the juvenile court did not err in determining the evidence did not support a finding of regular visitation and contact.

"The first element—regular visitation and contact—is straightforward.  The question is just whether 'parents visit consistently,' taking into account 'the extent permitted by court orders.' [Citation.]" (*Caden C.*, *supra*, 11 Cal.5th at p. 632.)  The juvenile court credited the evidence that mother canceled 22 out of 49 visits in the period between late February and mid-August 2024.  While there is evidence she consistently visited when Ezekiel was with maternal grandmother, the court was entitled to consider the evidence that visitation had become inconsistent.[5] The court recognized mother had missed some visits because of her pregnancy and DCFS's inability to provide a monitor.  However, mother herself canceled 22 out of 49 visits, or approximately 45 percent of visits in the six months before the hearing.  (*In re Eli B.* (2022) 73 Cal.App.5th 1061, 1070 [record supported juvenile court finding that father failed to establish regular visitation where he missed "nearly 40 percent of all

[5]     Mother cites her counsel's remark at the section 366.26 hearing that approximately 100 visits were consistent, seemingly referring to the period when Ezekiel was in maternal grandmother's care.  Counsel's statement does not constitute admissible evidence, as DCFS points out.  However, we note that the section 366.26 report stated: "During the time the child was placed with [maternal grandmother], it was reported that mother had visits three to four times a week."

14

visits"].)  Even between January 19 and mid-May, before mother's childbirth and DCFS changing its monitor policy in June, mother canceled 19 visits and only had 7 visits with Ezekiel—despite being offered visits three times a week.  The juvenile court was permitted to consider mother's inconsistency in the six months before the hearing, even though the visits before then were reportedly consistent for a time.  (Cf. *In re Breanna S.* (2017) 8 Cal.App.5th 636, 647 [affirming order terminating parental rights where parents visited "only sporadically during the first 18 months of the dependency proceedings" even though they "became more regular" during final six months before § 366.26 hearing], disapproved on other grounds in *Caden C.*, *supra*, 11 Cal.5th at pp. 637, 638, fns. 6 & 7.)

Substantial evidence supported the juvenile court's finding that mother did not establish regular visitation and contact.  As a result, the parental benefit exception did not apply.  Although we need not address mother's arguments that substantial evidence did not support the second or third prongs of the parental benefit exception and the juvenile court abused its discretion, we briefly address the issue of detriment.

## B. Detriment

Even assuming mother established the second prong of the parental benefit exception, we would conclude the trial court did not err in finding mother did not establish the third prong.  In assessing the third element of the parental benefit exception, courts must determine "whether the harm of severing the relationship outweighs 'the security and the sense of belonging a new family would confer.'  [Citation.]  'If severing the natural parent/child relationship would deprive the child of a substantial,

15

positive emotional attachment such that,' even considering the benefits of a new adoptive home, termination would 'harm[ ]' the child, the court should not terminate parental rights. [Citation.] That subtle, case-specific inquiry is what the statute asks courts to perform: does the benefit of placement in a new, adoptive home outweigh 'the harm [the child] would experience from the loss of [a] significant, positive, emotional relationship with [the parent?]' [Citation.]" (*Caden C.*, *supra*, 11 Cal.5th at p. 633.)

Mother contends the juvenile court ignored evidence that Ezekiel was happy and excited to see her, she was attentive and loving, he was comfortable in her presence, and their interactions were positive. Mother also highlights that DCFS recognized Ezekiel's positive emotional attachment to mother and concluded there would be "some negative impact" on Ezekiel if all visits with mother stopped. She points to evidence that when mother missed a visit, the caregiver reported that Ezekiel became frustrated and sad, and said "no" more often.

However, the question facing the juvenile court was not simply whether Ezekiel and mother had a positive relationship. The court was required to determine whether the relationship was "so important to [Ezekiel] that the security and stability of a new home wouldn't outweigh" the loss of that relationship. (*Caden C.*, *supra*, 11 Cal.5th at p. 633.) Thus, a "parent must show more than frequent and loving contact or pleasant visits." (*In re C.F.* (2011) 193 Cal.App.4th 549, 555.)

Mother has not met this burden. For example, the facts here are significantly different from those in *Caden C.*, where an expert opined that the child had such an "intense bond" with mother that it would "impede Caden in forming relationships with others," and the loss of contact with mother would lead to

16

"emotional fluctuation, confusion, and acting out in the near term and in adolescence," as well as "difficulties in school, insomnia, anxiety, or depression." (*Caden C.*, *supra*, 11 Cal.5th at pp. 628, 633.) Mother has not established that Ezekiel's attachment to mother was so "significant" that their continued relationship would provide Ezekiel more than "some incidental benefit." (*In re Autumn H.* (1994) 27 Cal.App.4th 567, 575.)

Mother failed to proffer evidence that Ezekiel would suffer substantial detriment if the juvenile court terminated parental rights. Since January 2024, mother's visitation had been inconsistent. While Ezekiel appeared happy to see mother and their visits were mostly positive, there was evidence that in visits shortly before the section 366.26 hearing, Ezekiel had been violent with mother, suggesting a negative impact from their interactions. The foster mother reported that Ezekiel appeared emotionally drained and tired after visits with mother and more " 'clingy.' " However, he did not seem disturbed or particularly upset at ending the visits with mother.[6] DCFS indicated that after a missed visit, Ezekiel did not appear negatively impacted. Further, there was no evidence that Ezekiel suffered any distress

---

[6] Mother submitted a video and transcript of the video into evidence at the section 366.26 hearing from November 2023. Mother asserted that the video showed Ezekiel did not want mother to leave at the end of a visit. Minor's counsel argued the video showed mother with a toy or some object that Ezekiel wanted, and him reaching for the toy as mother told him no. The trial court agreed that the video depicted Ezekiel wanting an item in mother's hand and not getting what he wanted. Moreover, even assuming mother is correct and the video depicts Ezekiel not wanting mother to leave on this occasion in November 2023, we would find no abuse of discretion.

17

during the periods when mother was not visiting. (*In re A.L.* (2022) 73 Cal.App.5th 1131, 1158–1159 [evidence showed father's visits were consistent and positive, but the child had no difficulty separating and missed visits did not affect him, and potential benefit of adoption outweighed the harm].)

The juvenile court also properly considered the significant benefits to Ezekiel in his new adoptive home. He had reportedly bonded with his caregivers. He was healthy, thriving, and developmentally on target. He was also receiving regular therapy and was in preschool for the first time. This was evidence that Ezekiel stood to benefit from the safety and security of a new adoptive home.

Mother argues the juvenile court abused its discretion when it remarked on mother's ongoing domestic violence and lack of stability. The juvenile court was not permitted to consider whether mother or the foster parents were better caregivers, or to assign blame or make moral judgments about mother's fitness as a parent. (*Caden C.*, *supra*, 11 Cal.5th at pp. 638, 642–643.) However, as the court explained in *Caden C.*, a parent's struggles with the issues leading to dependency may be relevant if they are probative of whether continued interaction between parent and child would have a negative effect on the child. (*Id.* at p. 637.) Mother's lack of stability, as noted by the juvenile court, could be considered to the extent it caused harm to Ezekiel through her inconsistent visitation and inability to be a regular presence in his life.

Regardless, even if the juvenile court inappropriately considered mother's instability and domestic violence, we do not reverse for harmless error. (*In re J.R.* (2022) 82 Cal.App.5th 526, 531.) Thus, even when a parent alleges the juvenile court

considered an improper factor in assessing an element of the parental benefit exception test, if "the record in this case would not support a finding in mother's favor on the parental benefit exception," we need not reverse.  (*Ibid*.; see *id*. at pp. 532–533.)

On the record before us, we cannot find that " ' " 'under all the evidence, viewed most favorably in support of the trial court's action, no judge could reasonably have made the order that he [or she] did.' " ' " (*Caden C.*, *supra*, 11 Cal.5th at p. 641.)  We find no error in the trial court's determination on the third element of the parental benefit exception.

## DISPOSITION

The juvenile court order is affirmed.

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**


ADAMS, J.


We concur:


EDMON, P. J.


KLATCHKO, J.*

---

\* Judge of the Riverside Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.